UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| VINCENT L. BREYFOGLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:13-CV-59 (CEJ) |
| | ) | |
| CAROLYN W. COLVIN, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On July 20, 2010, plaintiff Vincent L. Breyfogle protectively filed an application for supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of April 16, 2010. (Tr. 148-53). After plaintiff's application was denied on initial consideration (Tr. 94-98), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 109-11).

Plaintiff and counsel appeared for a hearing on May 9, 2012. (Tr. 22-76). The ALJ issued a decision denying plaintiff's application on August 21, 2012 (Tr. 13-22), and the Appeals Council denied plaintiff's request for review on May 14, 2013. (Tr. 1-4). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

## A. Disability Application Documents

In his Disability Report (Tr. 168), plaintiff listed his disabling conditions as bipolar disorder, anxiety, depression, hepatitis C, high blood pressure, fatigue, and pain. In the past, plaintiff worked as a cook, a furniture mover, and a laborer. Plaintiff reported taking Aleve for pain and headaches and Zantac for stomach pain.

In his Function Report (Tr. 188-98), plaintiff wrote that he lives in a house with a roommate. On an average day, he visits the doctor, takes care of his pet dogs, does light household chores with frequent breaks, and cooks light meals. Plaintiff goes outside every day, and shops for food, clothing, and toiletries once per week. He is able to drive and performs these errands alone. He stated that he needs reminders to go shopping, go to the doctor, groom, and take his medicine. He reported no problem with personal care, although sometimes he is fatigued and does not want to groom. His hobbies include reading and watching television. He said that he has trouble completing tasks and focusing, and estimates that he can pay attention for fifteen minutes at a time. He also struggles with following and understanding spoken instructions. He stated that he does not spend time with others, because he does not get along with other people, and feels stressed and paranoid. He stated that he is able to walk one mile before needing to rest for half an hour. He has difficulty handling changes in routine, which cause him to feel stressed.

Plaintiff's father's girlfriend, Barbara Homeyer, submitted a third-party function report on behalf of plaintiff. (Tr. 199-206). She stated that she has known plaintiff for three years, and sees him twice monthly. She wrote that plaintiff has problems with pain and nervousness, and has difficulty concentrating. She stated that plaintiff performs chores around the house, like cleaning, doing laundry, doing dishes, and

-2-

mowing the lawn on a riding mower, and that he occasionally sees friends or talks on the phone with his son.

## B. <u>Hearing on May 9, 2012</u>

At the time of the hearing, plaintiff was 44 years old, 5'10" tall, and weighed 195 pounds. He stated that he lived in a farmhouse with a roommate on his father's farm in Stoutsville, Missouri. He was separated from his wife, and he had one son who lives with plaintiff's mother. Plaintiff confirmed that he has a 10th grade education, and earned his GED. From 1991 to 1999 he worked as a cook in a restaurant. In 2007 he worked as a laborer with a furniture company. From 2007 to 2009 he was employed by two moving companies, doing work that involved moving furniture and lifting up to 100 pounds. He stopped working because arthritis in his neck and hands prevented heavy lifting. He stated that he could not find a job because he is nervous, paranoid, defensive, aggressive, and has panic attacks. He received food stamps and was on Medicaid. Plaintiff has a criminal history, and has been incarcerated three times for offenses of possession of a controlled substance, stealing, and forgery. He was released from his most recent prison term of 22 months in April 2009.

Plaintiff testified about his medical conditions, including arthritis, hepatitis C, stomach pain, hypertension, growths on his kidneys, and anxiety. He explained that he has arthritis in his hands, neck, and knees, and that his pain level varies with the weather. He was seeing a pain management doctor, who prescribed medications and gave plaintiff epidural injections in his spine. The injections briefly relieved his pain but also made him nauseous. He also received cortisone shots in his knees. Plaintiff was taking interferon and other medications for hepatitis C. He experienced side effects from these medications including depression, fatigue, and stomach problems. He

-3-

explained that his stomach hurts constantly, that he vomits several times per week, and he has diarrhea several times per day. Plaintiff was on medication for his blood pressure. He was seeing a psychologist monthly for counseling. He testified that, three to four times per week, he feels so paranoid and claustrophobic that he cannot leave his house or answer the telephone. He had panic attacks daily, experienced nervousness, and wanted to be alone. Nightmares and pain caused him to wake up several times each night. He was prescribed an assortment of antidepressants and sleeping pills, but he did not take them because they didn't work and they caused negative side effects.

Plaintiff testified that he does chores on the farm, including cleaning, cutting the grass, washing the porch, feeding the dogs, cooking basic meals, doing laundry and dishes, and grocery shopping. He did not go to large stores like Target or Wal-mart because he becomes anxious when he is around lots of people. He took hour-long, naps twice a day, sleeping in a reclining position to ease his neck. In the winter he spent more time lying down because his arthritis worsens with the cold weather. He smoked half a pack of cigarettes per day. He used to drink alcohol and use illegal drugs, but he stopped. He estimated that he could stand and walk for 20 to 30 minutes at a time, lift and carry 5 to 10 pounds, and sit for about 30 minutes. He could not tightly grip or work with precision with his hands. (Tr. 33-68).

Susan Shea, M.A., an independent consultant, testified as a vocational expert. The ALJ asked Ms. Shea about the employment opportunities for a hypothetical individual with plaintiff's education, age, and past work experience, who is capable of performing light work, involving simple and routine tasks, with only occasional climbing of ramps or stairs, stooping, kneeling, crouching, crawling, never climbing ladders,

-4-

ropes, or scaffolds, avoiding concentrated exposure to hazardous machinery and unprotected heights, only occasional changes in work setting, and only occasional interaction with the public and co-workers. Ms. Shea testified that such an individual would be unable to perform past work, but could be employed as cleaning/housekeeping at a light level (4,000 positions in Missouri and 915,000 positions nationally), a laundry worker at a light level (2,500 positions in Missouri and 900,000 positions nationally), and a light machine tender (7,000 positions in Missouri and 47,000 positions nationally). The ALJ then altered the hypothetical and asked which jobs would be available if that same individual could only occasionally use his upper left extremity for reaching overhead. Ms. Shea responded that such an individual would have the same available jobs. With the additional added limitation of only occasional supervision, Ms. Shea again responded that the job opportunities would not change.

The ALJ added to the other limitations the further limitation of sedentary work. Ms. Shea stated that the individual could do production-type jobs such as a cable worker (7,000 positions in Missouri and 472,000 nationally), hand assembly at the sedentary level (6,000 positions in Missouri and 280,000 nationally), or sedentary machine work (5,400 positions in Missouri and 242,000 nationally). The ALJ then asked whether jobs would be available for the same individual if he could not sustain full time work. Ms. Shea responded that there would not be any jobs available. She explained that no more than two unexcused absences are allowed per month, and no more than two five-minute breaks per hour.

Plaintiff's attorney asked Ms. Shea whether any jobs would be available if the hypothetical individual also had a "marked impairment" in his ability to interact

appropriately with public, supervisors, co-workers, and respond appropriately to usual work situations. Ms. Shea responded that there would not be any jobs available. The attorney asked whether jobs would be available if the individual had a "marked impairment" in the ability to make judgments on simple work-related decisions, and she responded there would be none. (Tr. 68-76).

## C. Records

Medical records from the Federal Bureau of Prisons dated from 2005 to 2009 show that plaintiff was treated for depression. He was prescribed Elavil. Plaintiff did well on this medication, and felt the medication to be effective. Psychological reviews conducted in June and July 2009 found that plaintiff suffered from no significant mental health problems. However, in August of 2009, plaintiff reported that he had stopped taking Elavil because it caused weight gain and nervousness.

On June 17, 2010, plaintiff presented at the emergency room in Farmington, Missouri with acute anxiety. Plaintiff refused all diagnostic tests, stated that he wanted to leave, and was discharged. Tr. 244. In August and September of 2010, plaintiff paid several visits to Andrew Quint, M.D., at the Family Health Center in Columbia, Missouri, for treatment of hepatitis C and hypertension. Dr. Quint prescribed Lisinopril, a blood pressure medication. Tr. 248; 273; 321.

On October 19, 2010, plaintiff went to an initial psychiatric evaluation at Burrell Behavioral Health Center. He reported suffering from anxiety and depression. He stated that he was not currently taking medication. Plaintiff was assessed with a GAF of 48. Tr. 416; 421-22. Plaintiff returned to Dr. Quint on November 10, 2010, and Dr. Quint increased his dosage of Lisinopril and ordered smoking cessation counseling. Tr.

410.   Plaintiff reported anxiety, and being fearful and paranoid around groups of people.   Tr. 414-15.

On November 15, 2010, plaintiff met with psychologist Patrick Finder.   He reported that he lived on a farm where he tended to the animals and did chores.   Mr. Finder noted that plaintiff had pressured speech, and he initially believed plaintiff to be under the influence of a stimulant such as cocaine or methamphetamine, but plaintiff denied this and convinced Mr. Finder otherwise.   Mr. Finder observed symptoms of severe anxiety, and plaintiff reported that he had suffered from anxiety since elementary school.   Mr. Finder assessed plaintiff's GAF as 40, and remarked that, "[g]iven the severity of his psychological symptoms, it is not felt that he would be able to obtain or maintain any type of employment at this point…. He does engage in some activities on the farm but these seem to be at his own pace and with his own choosing. It is not felt that he would be able to accomplish working for another individual at this time."   He also added that it was unknown how plaintiff might respond to appropriate medication.   Tr. 492.

On December 9, 2010, Mark Altomari, Ph.D., conducted a mental residual functional capacity (RFC) assessment, and found no marked limitations in functioning. He assessed plaintiff as "not significantly limited" or "moderately limited" in all categories, including understanding and memory, sustained concentration and persistence, social interaction, and adaptation.   Tr. 424-26.   Dr. Altomari also completed a psychiatric review technique form, and noted that plaintiff suffered from major depressive disorder, bipolar disorder, and generalized anxiety disorder, with a mild degree of functional limitation in activities of daily living, a moderate degree of

-7-

limitation in maintaining social functioning and concentration, persistence, or pace, and no repeated episodes of decompensation of extended duration. Tr. 427-38.

On December 24, 2010, plaintiff went to the emergency room of Hannibal Regional Hospital where he was seen by Timothy B. Raleigh, D.O. Plaintiff reported that he had pain in his neck and upper back after "wrestling a calf" two days earlier. Upon examination, plaintiff's muscles were spasming, and his left shoulder was elevated. He was prescribed Vicodin and Flexeril for the pain and spasms. Dr. Raleigh diagnosed plaintiff with torticollis, and found a degenerate change of his cervical spine. Plaintiff was discharged the same day. Tr. 577.

On February 24, 2011, plaintiff visited Joseph L. Spalding, D.O., with the Hannibal Regional Medical Group. Dr. Spalding diagnosed plaintiff with panic disorder with agoraphobia, bipolar disorder, and substance abuse in remission, with a GAF of 55. He prescribed Gabapentin and Propranolol for anxiety and hypertension. Tr. 459. On March 24, 2011, plaintiff returned to Dr. Spalding. He reported that he had taken the medications for three weeks, but then stopped because they "weren't making him feel right." He requested Valium. Dr. Spalding restarted plaintiff on Propranolol and prescribed Luvox for anxiety. Tr. 462. Plaintiff also saw Sohail Gulzar, M.D., for hypertension on March 24. He was started on Norvasc. He was also referred to Bhagirath Katbamna, M.D., for hepatitis C treatment. Tr. 465.

On April 11, 2011, plaintiff returned to Dr. Gulzar, complaining of neck strain. Upon examination, he did not appear anxious or depressed. Dr. Gulzar prescribed Tramadol for pain, and increased the Norvasc dosage. Tr. 469. Beginning in May 2011, plaintiff was seen by Dr. Katbamna for hepatitis treatment. Dr. Katbamna

-8-

ordered a liver biopsy which showed mild inflamation and stage 0-1 fibrosis. He prescribed Pegasys (peginterferon alfa-2a), Ribavirin, and Victrelis. Tr. 527-28.

On May 12, 2011, plaintiff saw Dr. Gulzar for pain. He did not appear anxious or depressed. He was given Norco for pain, and Benicar for hypertension (plaintiff had discontinued use of Propranolol again). Tr. 472. He was also seen by Dr. Spalding the same day. He reported being depressed, in pain, and having trouble sleeping. Dr. Spalding wrote that plaintiff "refuses to take mood stabilizers" and complains of side effects "with virtually any medication I suggest. While he stated he can't relax, he describes how he spends his day on the farm away from people and how much he likes it." Plaintiff requested Valium, and the doctor refused. Dr. Spalding wrote, "[t]his patient consistantly [sic] tries to get Valium and I made it clear I would not do this." The doctor prescribed Paxil for anxiety, and assessed plaintiff's GAF at 55. Tr. 475.

On June 9, 2011, plaintiff saw Dr. Gulzar for pain and the degeneration of his cervical disc. Dr. Gulzar remarked that he would give plaintiff 15 more pills (Norco), after which he would not prescribe any more opioids for plaintiff. Tr. 478. On June 13, 2011, plaintiff visited Syed Imam, M.D., at the Arthur Center. He was diagnosed with bipolar disorder, with symptoms of anxiety. His GAF score was 50. Dr. Imam prescribed Ambien and Prestig. Tr. 444-57. On June 20, 2011, plaintiff saw Luvell Glanton, M.D., at the Hannibal Center, for his neck pain, which was radiating into his arms. Dr. Glanton noted that plaintiff had discontinued his use of Benicar and Paxil, but was taking Norvasc, Norco, and Ranitidine. A CT-scan of the cervical spine revealed degenerative disc disease. Dr. Glanton developed a plan to give plaintiff epidural injections. Tr. 481.

On July 20, 2011, plaintiff visited Robert W. Jackson, D.O., for evaluation of his arthritis pain. Dr. Jackson noted that plaintiff had been discharged from the Army prematurely due to knee problems and later was in a motor vehicle accident that resulted in neck injuries. He wrote that recent X-rays showed degenerative joint changes in plaintiff's cervical spine. Plaintiff reported increased pain in his extremities, especially his hands. Dr. Jackson noted no anxiety or depressed mood. He diagnosed plaintiff with chronic diffuse arthralgias and myalgias with history of osteoarthritis and chronic pain syndrome. He developed a plan to reduce plaintiff's Vicodin with no refills, and to start Gabapentin. Tr. 530. Plaintiff also saw Dr. Katbamna that day, who noted that his hepatitis C was responding well to treatment. Tr. 532.

On August 29, 2011, plaintiff went to the emergency room at Hannibal Regional Hospital and was again treated by Dr. Raleigh. His chief complaint was neck pain. Plaintiff stated that he sees Dr. Gulzar but "cannot get" pain medication, and did not accept Dr. Glanton's treatment program. Plaintiff reported no nausea, vomiting, diarrhea, or abdominal pain. Dr. Raleigh refused to prescribe narcotics. He prescribed Ibuprofen and Ultracet, which plaintiff refused. Plaintiff was discharged that same day. Tr. 590.

From August 2011 to March 2012, plaintiff saw a family practitioner, Rodney Yager, D.O., approximately once a month for treatment of hypertension, indigestion, neck pain, knee pain, back pain, and anxiety. Dr. Yager prescribed a variety of medications including Vicodin, Prilosec, Metoprolol, Flexeril, and administered injections in plaintiff's knees. Tr. 536-555. On September 1, 2011, plaintiff returned to Dr. Jackson for a follow-up appointment for his neck and back pain. Dr. Jackson noted that plaintiff reported continuing to be active on the farm, working outdoors and

feeding cattle, and that plaintiff's back pain had recently been exacerbated. Dr. Jackson increased Gabapentin and refilled plaintiff's Vicodin prescription. Tr. 533.

On September 19, 2011, plaintiff again saw Dr. Katbamna, who noted that plaintiff's hepatitis was responding well to treatment, and plaintiff reported that he was doing well. Tr. 535. On September 30, 2011, plaintiff returned to psychologist Patrick Finder at Evergreen Behavioral Services. Plaintiff listed his current medications as Vicodin, and stated that his anxiety was "out of control." Tr. 490. In October and November of 2011, plaintiff saw Dr. Yager for counseling, where he learned techniques for dealing with panic attacks. Tr. 488-89.

From September through December 2011, plaintiff visited Bradford Ross Noble, D.O., several times for evaluation and management of his neck, back, knee, ankle, and hand pain. Dr. Noble wrote that plaintiff had cervical degenerative disc disease, and began epidural steroid injections. Tr. 500; 506; 509; 514. Plaintiff also visited Miguel Chuquilin, M.D., on October 26, 2011, reporting neck pain radiating down his left upper extremity and numbness in his left hand. Dr. Chuquilin found electro-diagnostic evidence of mild left median neuropathy at plaintiff's wrist and left ulnar neuropathy at plaintiff's elbow. Tr. 518.

On March 20, 2011, plaintiff returned to the emergency room after an increase in his back pain. He was treated by Aziz Doumit, M.D. Plaintiff complained of acute pain. A CT-scan of his cervical spine showed degenerative disc disease. Dr. Doumit prescribed Tylenol, Prednisone, and Flexeril. Plaintiff was discharged that same day. Tr. 567.

On January 26, 2012, Mr. Finder completed a physician's disability evaluation for the Missouri Department of Social Services. He wrote that plaintiff had severe

-11-

anxiety, anger, and panic, and assessed plaintiff's GAF at 40. Tr. 614. On April 17, 2012, plaintiff visited Dr. Yager for the results of a CT-scan of his abdomen. The scan showed abnormal areas on his liver and spleen, and the doctor recommended an MRI. Tr. 626. Plaintiff returned to Dr. Yager on April 23, 2012. The doctor prescribed Flexeril and Vicodin for back pain, and arranged a CT-scan with contrast for plaintiff's left renal cyst. Tr. 628.

Mr. Finder completed a Medical Source Statement on April 27, 2012, finding moderate restriction in plaintiff's ability to understand, remember, and carry out simple instructions, marked limitations in his ability to make judgments, understand, remember, and carry out complex instructions, and extreme limitations in his ability to make judgments on complex work-related decisions. He also noted marked impairments in interacting appropriately with the public, supervisors, and co-workers, and dealing with changes in routine. Mr. Finder remarked that plaintiff has extreme anxiety, aggression, attention deficit, and hyperactivity. Tr. 557.

From May through August 2012 plaintiff visited Dr. Yager several times, and continued to receive prescriptions for Vicodin. Tr. 630; 635; 637; 641. Plaintiff also visited Dr. Noble during that time period, and received steroid injections. Tr. 643; 646. On June 21, 2012, an MRI of plaintiff's abdomen revealed two possible cysts involving his left kidney. An additional MRI was recommended for a definitive diagnosis of these lesions. Tr. 633.

### III. The ALJ's Decision

In the decision issued on August 21, 2012, the ALJ made the following findings:

1.      Plaintiff has not engaged in substantial gainful activity since July 20, 2010, the application date.

2.     Plaintiff has the severe impairments of hypertension, hepatitis C, degenerative disc disease of the cervical spine, left ulnar neuropathy at the elbow, left renal cyst(s), major depressive disorder, generalized anxiety disorder, polysubstance dependence in sustained remission, and rule out bipolar disorder.

3.     Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.     Plaintiff has the residual functional capacity to perform the light work, as defined in 20 C.F.R. 416.967(b), except that he should avoid climbing ramps or stairs more than occasionally and never climbing ladders, ropes, and scaffolds, as well as only occasionally stooping, kneeling, crouching, crawling, and reaching overhead with the left upper extremity. He should avoid concentrated exposure to unprotected heights and hazardous machinery. He is limited to simple, routine tasks with only occasional changes in the work setting and only occasional interaction with the public and co-workers.

5.     Plaintiff is unable to perform any past relevant work.

6.     Plaintiff was born on September 30, 1967 and was 42 years old on the date the application was filed.

7.     Plaintiff has at least a high school education, and is able to communicate in English.

8.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the plaintiff is "not disabled," whether or not the plaintiff has transferable job skills.

9.     Considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the plaintiff can perform.

10.    Plaintiff has not been under a disability, as defined in the Social Security Act, from July 20, 2010, the date the application was filed.

(Tr. 13-22).

## IV.  Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187

(8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite [his] limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative

assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff argues that the Appeals Council erred in failing to consider new medical evidence. Plaintiff also contends that the ALJ erred in (1) failing to properly weigh the opinion of the treating psychologist; (2) making a "patently erroneous" credibility determination; (3) failing to include detailed findings to adequately support the RFC assessment; (4) finding plaintiff did not have a listed mental impairment; and (5) failing to identify plaintiff's left median neuropathy of the wrist and obesity as severe impairments. The Court will discuss each issue in turn.

### A. Additional Medical Evidence

On February 14 and 15, 2013, plaintiff submitted records of additional medical treatment to the Appeals Council. The records describe treatment rendered in December 2012 and February 2013. The Appeals Council did not consider the records because they related to a period of time after the ALJ's August 21, 2012 decision, and therefore did "not affect the decision about whether you were disabled beginning on or before August 21, 2012." The Appeals Council further advised plaintiff, "If you want us to consider whether you were disabled after August 21, 2012, you need to apply again." Tr. 2.

When new and material evidence is submitted to the Appeals Council,

[t]he Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R. §404.970(b). "Under this regulation, if a claimant files additional medical evidence with a request for review prior to the date of the Secretary's final decision, the Appeals Council MUST consider the additional evidence if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir. 1990). "To be 'new,' evidence must be more than merely cumulative of other evidence in the record. To be 'material,' the evidence must be relevant to claimant's condition for the time period for which benefits were denied. Thus, to qualify as 'material,' the additional evidence must not merely detail after-acquired conditions or post-decision deterioration of a pre-existing condition." Bergmann v. Apfel, 207 F.3d 1065, 1069-70 (8th Cir. 2000) (citations omitted).

-17-

The records submitted to the Appeals Council show that on December 18, 2012, plaintiff had an MRI of his lumbar spine that revealed disc bulges, multilevel degenerative disc disease, and facet arthropathy involving the lumbar spine. The MRI also showed a left renal cyst. See Doc. #12 at 35. Plaintiff saw Dr. Glanton on February 5, 2013, complaining of lower back pain. Plaintiff reported that the onset of the pain was gradual and had begun six months earlier. See id. at 22. To the extent that these records pertain to plaintiff's renal cyst, the evidence is not new. It is cumulative of the other evidence in the record relating to the lesions on plaintiff's kidney. To the extent that the records concern plaintiff's lumbar spine, the evidence is not material because it deals with an after-acquired or a deteriorating condition. Prior to August 21, 2012, plaintiff had complained only of cervical spine pain. Moreover, the medical records from February state that the pain began approximately six months prior to the visit—right around the time of the ALJ's August decision. Accordingly, the Appeals Council did not err in not considering the additional medical evidence.

## B. Assessment of Treating Psychologist's Opinion

Plaintiff argues that the ALJ erred in failing to give adequate weight to the opinion of his treating psychologist, Mr. Finder. Generally, a treating physician's opinion is given more weight than other sources in a disability proceeding. Anderson v. Astrue, 696 F.3d 790, 793 (8th Cir. 2012) (citing 20 C.F.R. §404.1527(c)(2)). Indeed, when the treating physician's opinion is supported by proper medical testing, and is not inconsistent with other substantial evidence in the record, the ALJ must give the opinion controlling weight. Id. "However, [a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent

-18-

opinions that undermine the credibility of such opinions." Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) (internal quotation omitted). Ultimately, the ALJ must "give good reasons" to explain the weight given the treating physician's opinion. 20 C.F.R. § 404.1527(c)(2).

In her decision, the ALJ set forth good reasons for giving Mr. Finder's opinion only minimal weight. Mr. Finder found that plaintiff suffered from extreme anxiety, anger, and panic, with a GAF of 40 and marked limitations in ability to function. However, as the ALJ noted, this conclusion is not supported by the record and is directly contradicted by the observations and opinion of another treating source, Dr. Spalding, who found plaintiff's GAF to be 55 and expressed skepticism of plaintiff's anxiety and plaintiff's professed side effects to every anxiety medication prescribed. Many of plaintiff's doctors did not observe any signs of depression or anxiety during plaintiff's visits. Mr. Finder was the only doctor to observe symptoms of extreme anxiety, and he remarked that it was unknown how plaintiff might respond if on medication.

The ALJ also noted that plaintiff only saw Mr. Finder on a few occasions. The frequency with which plaintiff was seen by the treating source can affect the amount of weight given to the source's opinion. See Busse v. Colvin, No. 4:12-CV-827 (CEJ), 2013 WL 3338566, at *16 (E.D. Mo. July 2, 2013) (citing 20 C.F.R. § 494.1527(d)(2)(1)). Finally, the ALJ explained that the statement of Mr. Finder regarding plaintiff's functional limitations was "the product of a pre-printed form questionnaire, submitted to him by the claimant's attorney, that includes a number of leading questions and similar inducements" and "is not designed for objectivity." Tr. 19. While the Court does not find that particular rationale for discrediting Mr. Finder

-19-

persuasive, the ALJ's other reasons for discounting his opinion were adequate.  Giving minimal weight to Mr. Finder's opinion was not an error.

### C.    Credibility Determination

An ALJ may discount a claimant's subjective complaints "if there are inconsistencies in the evidence as a whole."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  The ALJ must consider all evidence relating to those complaints, "including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: the claimant's daily activities; the duration, frequency and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions."  Id.  The court "will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so."  Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (internal citations and quotations omitted).

The ALJ found that plaintiff's statements regarding the intensity, persistence, duration, and impact of his impairment on his functioning were not fully credible.  The ALJ noted that the medical evidence did not support plaintiff's subjective complaints of pain.  Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004) (stating that lack of objective medical evidence is a factor the ALJ may consider in discounting a claimant's allegations of disabling pain).  No medical provider placed any long-term limitations on plaintiff's ability to exert himself.  Further, plaintiff's self-reported daily activities, including caring for a variety of animals on the family farm, do not support his complaints of physical limitation and pain.  See Haynes v. Shalala, 26 F.3d 812, 815

(8th Cir. 1994) ("[D]aily activities that are inconsistent with complaints of disabling pain also provide a basis for discounting subjective complaints.").

The ALJ noted that plaintiff's sporadic work history also undermined his credibility. Plaintiff held a job from 1991 to 1999 and from 2007 to 2009. The Eighth Circuit has held that "[a] lack of work history may indicate a lack of motivation to work rather than a lack of ability," and may negatively impact plaintiff's credibility. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) (citing Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993)). Plaintiff argues that the ALJ failed to account for plaintiff's time in and out of prison. While plaintiff could not recall the exact dates of his incarceration at the hearing, he testified that he was incarcerated three times—once in the late 1980s, once in the early 1990s, and once three years prior to the hearing. Tr. 55. The instances of incarceration do not explain plaintiff's unemployment between 1999 and 2007. Furthermore, while plaintiff's anxiety and mental problems have been present since his childhood, there is nothing to suggest that these conditions prevented him from working during that period of time.

The ALJ also observed that, at the hearing, plaintiff did not display any signs of depression, anxiety, memory loss, or mental disturbances. Plaintiff argues that the ALJ's first-hand observation is not an appropriate consideration in determining his credibility, and argues that the ALJ engaged in an impermissible "sit and squirm" analysis. "[T]he ALJ is not free to reject a claimant's credibility on account of the claimant's failure to sit and squirm during the hearing." Cline v. Sullivan, 939 F.2d 560, 568 (8th Cir. 1991). However, the ALJ *is* permitted to take notice of the claimant's demeanor during the administrative hearing. Id. The ALJ took her own observations into account, but did not unduly rely on them. This was not error. See, e.g., Smith

v. Shalala, 987 F.2d 1371, 1375 (8th Cir. 1993) (suggesting ALJ's observation of claimant during hearing was permissible consideration when assessing credibility).

Plaintiff also takes issue with the boilerplate language used by the ALJ to summarize the credibility determination.  However, when a credibility determination is otherwise explained and adequately supported by consideration of the relevant factors, the presence of this boilerplate language is not problematic.  See Blackwell v. Colvin, No. 2:12-CV-58 (RWS), 2013 WL 5275954, at *11-12 (E.D. Mo. Sept. 18, 2013) (rejecting challenge to boilerplate language).

Finally, plaintiff argues that the ALJ erred in failing to make a credibility determination on the third-party function report submitted by plaintiff's father's girlfriend.  However, the ALJ did consider that statement, and specifically found it not credible.  The girlfriend had relatively limited interaction with plaintiff each month, and her personal connection with plaintiff's father created a likely bias.  While the ALJ is required to consider such third-party statements, see SSR 96-7p, she is not required to believe them.

The ALJ considered the appropriate factors before discounting plaintiff's subjective complaints, and reached a credibility determination that is supported by substantial evidence.  Accordingly, the Court will defer to the ALJ's adverse credibility determination.

### D.    Residual Functional Capacity (RFC) Assessment

RFC is what a claimant can still do despite his limitations.   Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011).  "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."  Id.   The ALJ must

determine the claimant's RFC based on "all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

In this case, the ALJ found that plaintiff has the RFC to perform light work, except that he should avoid climbing ramps or stairs more than occasionally, never climb ladders, ropes, and scaffolds, only occasionally stooping, kneeling, crouching, crawling, and reaching overhead with the left upper extremity, avoid concentrated exposure to unprotected heights and hazardous machinery, and limited to simple, routine tasks with only occasional changes in work setting and only occasional interaction with the public and co-workers. Plaintiff argues that the ALJ failed to include a narrative discussion describing how the evidence supports these conclusions.

In her opinion, the ALJ discusses the evidence of record. She explains that plaintiff's hypertension is somewhat controlled, that his hepatitis is in remission, and that while plaintiff reports arthralgias, radiographs of his knees show only mild to moderate degenerative changes. The ALJ accounted for plaintiff's neuropathy in his left extremity by including the limitation of reaching on the left side, and limits plaintiff to light work to accommodate the degenerative disc disease of plaintiff's cervical spine. Plaintiff argues that side-effects from his hepatitis C medication should have been considered in arriving at the RFC. However, the treatment notes of Dr. Katbamna, the doctor treating plaintiff's hepatitis, do not mention that plaintiff was suffering from these side-effects. There is no evidence—other than plaintiff's own statements—to show that plaintiff requires the inclusion of additional physical limitations in the RFC. As discussed previously, the ALJ's adverse credibility determination is supported by substantial evidence.

-23-

The ALJ explained that the records show plaintiff has a history of depression and anxiety, but refuses to take mood stabilizers. Plaintiff argues that these medications made his problems worse. However, the record shows that certain medications were effective at controlling plaintiff's symptoms. Tr. 475, 488, 497. The primary evidence supporting additional restrictions in psychological functioning is the opinion of Mr. Finder, which, as discussed above, the ALJ was justified in discounting.

The RFC is supported by substantial evidence on the record as a whole, and the ALJ adequately explained her RFC determination with a discussion of that evidence.

### E.     Listed Impairments

Plaintiff argues that his bipolar and anxiety disorders meet listings 12.04, Affective Disorders, and 12.06, Anxiety-Related Disorders.  In determining that plaintiff's mental impairments did not meet or equal a listed impairment, the ALJ considered whether the "paragraph B criteria" were satisfied. 20 C.F.R. §404, Subpt. P, App. 1 §12.00. To satisfy paragraph B, plaintiff's impairment must cause at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

The ALJ concluded that plaintiff had mild restrictions in activities of daily living, and explained that plaintiff has no problems with grooming or hygiene; that he can prepare meals and perform chores; that plaintiff has moderate restrictions in social functioning, as plaintiff has a roommate and leaves home on a regular basis; that plaintiff is moderately restricted in concentration, persistence, or pace, as he is able to perform chores, prepare meals, shop for groceries, care for pets and farm animals,

watch TV, and manage funds; and finally that plaintiff has had no episodes of decompensation of an extended duration. The ALJ found that because plaintiff's mental impairments do not cause at least two marked limitations or one marked limitation and repeated episodes of extend duration, the paragraph B criteria are not satisfied.

Plaintiff argues that this conclusion was incorrect, and had the ALJ properly weighed the opinion of Mr. Finder and understood plaintiff's global assessment functioning (GAF) scores, she would have found that plaintiff met the listings. As discussed previously, the ALJ provided good reasons for discounting Mr. Finder's testimony. Moreover, a GAF score is just one piece of evidence on the degree of an individual's mental impairment. See 65 Fed. Reg. 50746, 50765-65 (Aug. 21, 2000) ("[The GAF scale] does not have a direct correlation to the severity requirements in our mental disorder listings."). The ALJ did consider the range of plaintiff's GAF scores—as low as 40 (according to Mr. Finder) and as high as 55 (per Dr. Spalding). A GAF of 51 to 60 indicates moderate symptoms.

Plaintiff also argues that the ALJ improperly considered plaintiff's daily activities in concluding that plaintiff did not meet a listing. He argues that his ability to do housework is not evidence of an ability to maintain concentration, persistence, and pace in the workplace. However, the work plaintiff performs on his farm, including caring for 40 cattle, repairing fences, and doing yard-work, is evidence of an ability to focus and perform tasks requiring persistence.

In conclusion, the ALJ's findings that plaintiff's mental conditions do not meet a listing are consistent with the assessment of the consulting psychologist Mark Altomari, Ph.D., with plaintiff's daily activities, and are supported by the record as a whole.

### F.    Severe Impairments

Plaintiff argues that the ALJ erred in failing to include plaintiff's obesity and left median neuropathy of the wrist as severe impairments.  A severe impairment is an impairment or combination of impairments that significantly limits a claimant's physical or mental ability to perform basic work activities.  20 C.F.R. §§ 416.920(c); SSR 96-3p. Plaintiff did not allege obesity as an impairment in his disability report, mention obesity at the hearing, or seek treatment for that condition.  See Kliber v. Social Sec. Admin., 794 F.Supp.2d 1025, 1040 (D. Minn. 2011) (citing the failure to allege a condition in disability reports or testify to the condition at the hearing as support for ALJ's conclusion that the condition was not severe).  The medical evidence does not show that plaintiff's obesity caused any significant functional limitations or increased pain. Regarding plaintiff's left median neuropathy of wrist, there is only one mention of this condition in the entire record, in which electro-diagnostic testing confirmed the existence of this condition.  There is no indication that plaintiff sought treatment for his wrist, nor is there any indication that the condition would significantly limit plaintiff's ability to work.  The ALJ's decision to consider plaintiff's obesity and left median neuropathy of his wrist non-severe impairments is supported by substantial evidence in the record as a whole.

### VI.  Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in his brief in support of complaint [#12] is **denied**.

A judgment in accordance with this Memorandum and Order will be entered separately.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 26th day of August, 2014.